# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL ACTION NO.: 5:04CV106

| | |
|---|---|
| IN RE: )<br>)<br>KERRI BOLICK MCCULLOUGH, )<br>)<br>Debtor. )<br>_____ )<br>)<br>J. MICHAEL MCREE, )<br>)<br>Plaintiff/Appellee, )<br>) **ORDER**<br>v. )<br>)<br>KERRI BOLICK MCCULLOUGH, )<br>)<br>Defendant/Appellant. )<br>_____ ) | |

**THIS MATTER** is before the Court on Kerri Bolick McCullough's ("Appellant" or "Ms. McCullough") appeal from the Final Order and Judgment entered by the United States Bankruptcy Judge J. Craig Whitley on July 9, 2004. In his July 9, 2004 Order, Judge Whitley ruled that the debt owed by Ms. McCullough to J. Michael McRee ("Appellee" or "Mr. McRee") was non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), and Mr. McRee was permitted to retain documents regarding Ms. McCullough's financial history. Subsequent to the Court's Order, on July 16, 2004, Ms. McCullough filed a Motion for Reconsideration. On August 5, 2004, the Bankruptcy Court held a hearing on this motion and issued an Order on August 19, 2004, denying Ms. McCullough's Motion for Reconsideration.

The Appellant perfected her appeal by filing a brief with this Court on October 27, 2004.

1

The Appellee filed a responsive brief on December 1, 2004, to which the Appellant did not file a Reply. This appeal is now ripe for disposition.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mr. McRee and Ms. McCullough's mother, Linda McRee ("Ms. McRee") were married in August of 1997, and were still living together as husband and wife in March, 2001. (Trial Tr. p. 7). Ms. McCullough met Mr. McRee at some point in 1996 through introductions by Ms. McRee. (*Id.* p. 72). Sometime prior to March 8, 2001, Ms. McCullough discussed with her mother and her step-father, Mr. McRee, the possibility of forming a business venture. (*Id.* p. 8). The basis for the venture was the acquisition of certain acreage in Catawba County and the subsequent development of this property ("the Project"). (*Id.* pp. 11, 76). In furtherance of the Project, Ms. McCullough approached BB&T bank to inquire about obtaining financing in the form of a line of credit. (*Id.* p. 77). The bank advised Ms. McCullough that such financing could be arranged if a certain amount of working capital was obtained. (*Id.*). Ms. McCullough asked Ms. McRee and Mr. McRee whether they wanted to invest in the Project. (*Id.*). Due to his conversations with Ms. McCullough, Mr. McRee believed that at least $75,000 was needed in initial capital.[1] Ms. McCullough explained that the investment would be "long term," as it would take a significant period of time to develop the property, build houses, sell the houses, and derive a profit. (*Id.* pp. 77-78). Ms. McCullough advised Mr. McRee that any money invested would not see a return for about five years. (*Id.* 19-20). These discussions culminated in a meeting at Mr. McRee's home on March 8, 2001, at which time Mr. McRee gave Ms. McCullough a check

---

[1] Mr. McRee testified that Ms. McCullough told him that the bank required $75,000 in capitol before it would extend a line of credit. (Trial Tr. p. 11). In contrast, Ms. McCullough testified that the bank required $50,000 working capital in order to extend the line of credit. (*Id.* p. 77).

2

for $40,000, which he noted on the check as an "investment." Ms. McRee also invested in the Project by giving Ms. McCullough $10,000. (*Id.* pp. 8-9). This money was invested toward "start-up" capital so that the new Company could obtain a bank loan, make a down payment on the land, and obtain a contractor's license. (*Id.* pp. 11-12). At the time that Ms. McCullough received the money from Mr. and Ms. McRee, her personal bank account had a balance of negative "three seventy-seven 'o' eight." (*Id*. p. 61).

In light of the total contribution by Ms. and Mr. McRee of $50,000, and the anticipated working capital of $75,000, Mr. McRee believed that Ms. McCullough would invest $25,000 of her own money into the Project. (*Id.* pp. 10-13). During their conversation on March 8, 2001, it was clear that Ms. McCullough was to set up the Corporation. (*Id.* pp. 9-14). Additionally, Mr. McRee asked that in exchange for his $40,000, he receive a forty percent (40%) interest in the Company. (*Id.* pp. 13-14). Ms. McCullough never responded to this request. (*Id.* pp. 14).

On March 9, 2001, Ms. McCullough opened a corporate bank account under the name "Legacy Home Solutions" ("Legacy") and deposited the $50,000 into the account. (*Id.* 18-19). The following Monday, March 12, 2001, Ms. McCullough wrote a check payable to herself from the Legacy bank account in the amount of $2,000, which she characterized as a "Note Advance." (*Id.* p. 19). Over the next several months, Ms. McCullough continued to write herself checks out of the Legacy account, usually in an amount of $1,000 or $2,000, with a notation on each check indicating that the payment was for a "note advance" or "reimbursement." (*Id.* pp. 57-60). Specifically, from March 12, 2001, through July 13, 2001, Ms. McCullough wrote checks to herself from the Legacy account in a total amount of $30,284. (*Id.* p. 18). In addition to these "note advances," Ms. McCullough took money out of the Legacy account to pay for computer

3

equipment, automobile costs, and other expenses. (*Id.* pp. 25-26, 66). Moreover, from May 24, 2001, through November 29, 2001, in order to continue her health insurance, Ms. McCullough paid $1,850 from the Legacy account to her prior employer, Corning Credit Union. (*Id.* p. 60). Between March 23, 2001, and August 2, 2001, Ms. McCullough also paid her brother, Derek Martin, $3,800 for his assistance in the Project. (*Id.* p.66). Additionally, Ms. McCullough paid $4,500 for engineering fees and $4,200 for a land survey. (*Id.* 91, 92). By June 30, 2001, just three months after the deposit of the $50,000 from Mr. and Ms. McRee, the Legacy account only had a balance of $7,110.85. (*Id.* p. 22).

On March 14, 2001, Ms. McCullough entered into a contract on behalf of Legacy to purchase the land that was the subject of the Project and simultaneously made an earnest money deposit of $5,000. (*Id.* p. 22). This contract was contingent upon receipt of a commitment by the City of Hickory and the City of Newton for water and sewer services. (*Id.* 86). When the City of Hickory and the City of Newton refused to provide sewer and water services to the Project, the proposed land purchase did not close and this earnest money was refunded to Legacy. (*Id.* p. 63).

Other than the initial $50,000 investment by Mr. and Ms. McRee, Legacy had no additional income in the year 2001. (*Id.* p. 22). In fact, by July 31, 2001, the Legacy account was down to $1,599.67 and the Company had ceased any meaningful business activity. ( *Id.* p. 26). Further, it was not until September 2001, that the North Carolina Secretary of State's office issued a corporate charter under the name of "Legacy Home Solutions, LLC." (*Id.* p. 21, 55). Notably, Ms. McCullough never invested any money into the Project. ( *Id.* p. 63). Although Ms. McCullough's personal checking account was incurring significant overdraft fees, Ms. McCullough had retirement funds available, which she declined to invest in Legacy once she felt

4

the Project was no longer feasible. (*Id.*).

From March 9, 2001, until the demise of the Project, although Mr. and Ms. McRee were authorized signatories on the Legacy account, Ms. McCullough had Legacy's checkbook in her possession and exercised complete control over the Company. (*Id.* p. 82). In fact, Ms. McCullough was the only individual to ever write checks out of the Legacy account. (*Id.* p. 47).

For several months after Mr. McRee invested $40,000 in the Project, there were discussions between Ms. McCullough, Ms. McRee, and Mr. McRee as to Legacy's progress. (*Id.* p. 15). However, by the summer of 2001, Ms. McCullough was not forthcoming with information regarding the Project. (*Id.* pp. 23-24). Furthermore, Ms. McCullough did not maintain corporate minutes nor did she prepare an organizational agreement specifying the percentage ownership of the members in the Company. (*Id.* pp. 97-98). During the life of the Company, there was only one meeting regarding the Project, which occurred during the week of July 4, 2001. (*Id.* pp. 23-24). Mr. McRee, Ms. McRee, and Ms. McCullough were all present at this meeting; however, no significant information regarding Legacy's financial status was shared by Ms. McCullough. (*Id.*).

At some point in late summer or early fall of 2001, Mr. McRee began asking Ms. McRee to obtain an update from Ms. McCullough regarding the status of the Project. (*Id.* pp. 27-28, 48). Mr. McRee never received an update. (*Id.*). However, by the end of 2001, it was clear that Legacy was out of business and Mr. McRee began asking Ms. McCullough - through her mother, Ms. McRee - for the return of his $40,000 investment, which he assumed the Company still held. (*Id.* pp. 41-42, 48). Ms. McCullough never returned this money to Mr. McRee as the capital in the Legacy account contained little over $1,000. (*Id.* pp. 26, 55). Moreover, despite his request

5

for a forty percent (40%) ownership in the Company, the 2001 corporate tax return listed Mr. McRee's ownership interest at ten percent (10%). (*Id.* p. 56).

Mr. and Ms. McRee separated in October 2002. Subsequently, on January 6, 2003, Ms. McCullough filed Chapter 7 bankruptcy and listed Mr. McRee as a Schedule F creditor in an amount of $40,000.[2] (*Id.* pp. 16, 55).

Mr. McRee brought an adversary action against Ms. McCullough, seeking to recover the $40,000 investment he provided for the Project and requesting that this amount be declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2). After a trial, the bankruptcy judge entered a Final Order and Judgment, finding against Ms. McCullough and holding that her debt to Mr. McRee is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). Specifically, the bankruptcy judge concluded, in pertinent part, that: (1) Ms. McCullough intentionally misrepresented material facts to Mr. McRee through her silence[3] (Trial Tr. p. 135); (2) Mr. McRee was induced to participate in the Project due to the familial relationship, as well as the misrepresentations made by Ms. McCullough. ( *Id.* p. 136); (3) Despite the need for Mr. McRee to ask additional questions, based on the nature and relationship of the parties, Mr. McRee justifiably relied on Ms. McCullough's representations. (*Id.* p. 137); (4) Mr. McRee indisputably suffered harm as a result of Ms. McCullough's representations. (*Id.* p. 136); (5) In the alternative, Ms. McCullough owed a fiduciary duty to Mr. McRee, which she breached when she

---

[2]Despite the fact that Mr. McRee gave Ms. McCullough $40,000 and clearly noted such payment as an "investment," as opposed to a loan or debt, the parties have never disputed whether Mr. McRee was properly listed as a Schedule F creditor in Ms. McCullough's Chapter 7 bankruptcy. Consequently, such argument at this point is moot and the Court will not address that issue.

[3]Such misrepresentation by suppression of the true facts include the false beliefs that Ms. McCullough would be an equity participant in the Project, that Mr. McRee would receive 40% of the stock, and that Ms. McCullough would not make immediate and substantial withdrawals for payment to herself. (Trial Tr. p. 135).

6

did not use the money from Mr. McRee for the Project and failed to keep Mr. McRee apprised of the progress of the Company, which constituted defalcation. (*Id.* p. 137). Ms. McCullough subsequently filed the instant appeal.

## II. ISSUES ON APPEAL

Appellant raises the following issues on appeal:

1) Was the evidence at trial sufficient as a matter of law to render the debt claimed by the Appellee against the Appellant non-dischargeable under the exception to discharge set forth in 11 U.S.C. § 523(a)(2)(A)?

2) Did the Bankruptcy Court have authority to make a decision regarding custody of documents obtained from the Chapter 7 bankruptcy trustee in Ms. McCullough's bankruptcy case based upon their relevance in a state lawsuit?

## III. DISCUSSION

**A.    Standard of Review**

This Court has jurisdiction to hear this appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). In reviewing the decision of the bankruptcy court, this Court functions as an appellate court and applies the same standard of review. Thus, factual findings are reviewed for clear error. FED. R. BANKR. P. 8013. Findings of fact are clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Green*, 934 F.2d 568, 570 (4th Cir. 1991) (citing *In re First Fed. Corp.*, 42 B.R. (W.D. Va. 1984)). In contrast to findings of fact, conclusions of law are reviewed *de novo*. *See Loudon Leasing Dev. Co. v. Ford Motor Credit Co.*, 128 F.3d 203 (4th Cir. 1997); *In re Johnson*, 960 F.2d 396 (4th Cir. 1992).

7

**B.        Section 523(a)(2)(A) - Actual Fraud, False Pretenses and Misrepresentation**

When addressing exceptions to discharge, the courts traditionally interpret the exceptions narrowly in order to protect the purpose of providing debtors with a fresh start. *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)). Conversely, the courts are "equally concerned with ensuring that the perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998)).

Pursuant to 11 U.S.C. § 523(a)(2), a debt is non-dischargeable to the extent it is obtained by "(A) false pretenses, a false representation, or actual fraud. . . ." Congress designed Section 523(a)(2)(A) to except from discharge those obligations arising from conduct that amounts to actual fraud under common law. *Stahl v. First Deposit Nat'l Bank*, 222 B.R. 497, 502 (W.D.N.C. 1998). "'Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.'" *Stahl*, 222 B.R. at 502-03 (quoting 4 Lawrence P. King, et. al., COLLIER ON BANKRUPTCY § 523.08[1][E] at 523-44 (15th ed. rev. 1997)). Therefore, paragraph (A) of Section 523(a)(2) pertains to actual or positive fraud, as opposed to fraud that is implied by law. *Stahl*, 222 B.R. at 503.

The Supreme Court of the United States established that the terms within Section 523(a)(2)(A) should be interpreted according to the common understanding of those terms at the time the statute was enacted. *Field v. Mans*, 516 U.S. 59, 70 (1995). To define "actual fraud"

the Supreme Court looked to the RESTATEMENT (SECOND) OF TORTS (1976), which defines the tort of fraudulent misrepresentation as follows:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused by him by his justifiable reliance upon the misrepresentation.

*In re Biondo*, 180 F.3d at 134 (quoting RESTATEMENT (SECOND) OF TORTS § 525 (1976)). Thus, although Section 523 does not enumerate the elements for a cause of action pursuant to paragraph (A), the provision has been interpreted to incorporate the common law elements of proof for fraudulent misrepresentation. *Id*. Therefore, a creditor must establish all of the following elements by a preponderance of the evidence in order to prevail under Section 523(a)(2)(A): (1) the debtor made a false representation; (2) at the time of making the representation, the debtor knew such representation was false; (3) the debtor made the representation with the purpose and intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained a loss as a result of the representation.[4] *In re Biondo*, 180 F.3d at 134; *In re Loignon*, 308 B.R. at 248-49; *Stahl*, 222 B.R. at 503.

Notably, exceptions to discharge are narrowly construed to further the Bankruptcy Code's "fresh start" policy. *In re White*, 128 Fed. Appx. 994, 998 (4th Cir. April 28, 2005). However, the purpose of some sections of the Bankruptcy Code, "'is to make certain that those who seek shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.'" *Id.* (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997)). Section

---

[4]The parties do not dispute the bankruptcy court's finding that Mr. McRee suffered harm through the loss of his $40,000. Therefore, this Court will not review this element in the analysis below.

523(a)(2)(A) is intended to make certain that those who obtain property by fraudulent means cannot find bankruptcy protection. *Id.*

In considering the evidence presented in the instant case, the Bankruptcy Court concluded that Mr. McRee had established fraudulent misrepresentation. In the alternative, the Bankruptcy Court found that Ms. McCullough's debt could not be discharged because while acting in a fiduciary capacity, she committed fraud or defalcation.

1.   **Knowing Misrepresentation by Debtor**

Element one is satisfied if the debtor's representation was known to be false or recklessly made without knowing whether it was true or false. *In re White*, 128 Fed. Appx. at 998 (citing *In re Woolley*, 145 B.R. 830, 834 (Bankr. E.D.Va. 1991)). "Pertinent considerations for determining recklessness are the debtor's pattern of conduct and prior business expertise." *Id.* (citing *In re Woolley*, 145 B.R. at 834-35).

The bankruptcy court found that three things Ms. McCullough did not disclose to Mr. McRee constituted misrepresentations. First, Ms. McCullough did not advise Mr. McRee that she was having financial difficulties at the time that he contributed the $40,000, and, in fact, Ms. McCullough led Mr. McRee to believe that she was going to contribute her own money to the Project and thereby be an equity participant. (Trial Tr. p. 134). Judge Whitley found that this was a material fact that would have affected Mr. McRee's decision regarding his investment in the Project. (*Id.* p. 135). Second, the bankruptcy court found from the evidence presented that Mr. McRee conditioned his investment on his receipt of forty percent ownership of stock in the Project. (*Id.* p. 135). Judge Whitley found that although Ms. McCullough did not make an affirmative statement in response to this request by Mr. McRee, she used his money with the full

10

knowledge that Mr. McRee expected a significant equity partnership, which he did not receive. (*Id.* p. 135). Third, Mr. McRee was not made aware that Ms. McCullough would make immediate and substantial withdrawals from his investment in the amount of two thousand dollars a week for living expenses, salary, draws, and other payments. (*Id.* p. 135). Judge Whitley stated that Ms. McCullough represented to Mr. McRee that his money was going toward a seventy-five thousand dollar investment. (*Id.* p. 135).

In her defense, Ms. McCullough argues that she did not knowingly make a materially false representation to Mr. McRee. (Def. Br. p. 8-9). Ms. McCullough contends that she did not owe Mr. McRee a fiduciary duty and, therefore, any silence on her part cannot amount to a misrepresentation. (*Id.*). Ms. McCullough further opines that she did not owe a fiduciary duty to Mr. McRee because he was badgered into this investment by Ms. McRee and there is no evidence that he particularly trusted Ms. McCullough in making this investment. (*Id.* p. 9).

This Court reviews the bankruptcy court's factual findings on this issue for clear error. FED. R. BANKR. P. 8013. Ms. McCullough's state of mind is a question of fact to be determined in the first instance by the bankruptcy court and that can only be overturned on appeal if the finding is clearly erroneous. *In re Biondo*, 180 F.3d at 134 (citing *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 467 (4th Cir. 1990)). Upon such review, the Court cannot say that the bankruptcy court committed clear error in finding that Ms. McCullough make knowing misrepresentations through her silence to Mr. McRee. Particularly the finding that Ms. McCullough did not disclose to Mr. McRee that she would be withdrawing substantial sums of money for her "salary," which resulted in a payment to herself of $30,284.23. Moreover, the Court does not find that the bankruptcy court committed

clear error in finding that Mr. McRee's belief that he would receive forty percent ownership in the Project, of which Ms. McCullough did not dissuade him but rather stayed silent, constituted misrepresentation. Therefore, the Court finds no clear error occurred.

### 2. Debtor's Intent to Deceive

"The conclusion that a debtor knew that his representations were false is closely linked to, but separate from, the issue of intent to deceive to influence another's conduct." *In re White*, 128 Fed. Appx. at 998. Notably, when the debtor has invested funds on behalf of another party, "'a debtor will be found to have acted with the requisite intent to defraud under § 523(a)(2)(A) when, at the time the transaction occurred, it is established that the debtor, for his or her personal gain, knowingly mislead the investor as to a material fact concerning the investment.'" *In re White*, 128 Fed. Appx. at 998 (quoting *In re Grim*, 293 B.R. 156, 163 (Bankr. N.D. Ohio 2003)). Evidence of the debtor's reckless indifference to the truth is sufficient to establish the requisite intent to deceive. *In re White*, 128 Fed. Appx. at 998-99 (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir 1997); *In re Bonnanzio*, 91 F.3d 296, 301 (2nd Cir. 1996); *In re Woolley*, 145 B.R. at 835). Since a debtor will rarely admit to acting with the intent to deceive, intent may be inferred from the totality of the circumstances. *In re White*, 128 Fed. Appx. at 999 (citing *Umpierrez*, 121 F.3d at 789; *In re Woolley*, 145 B.R. at 836).

The bankruptcy court here found that Ms. McCullough's reckless misrepresentations sufficed to form the scienter necessary to deny discharge of the debt. Judge Whitley noted that if Mr. McRee had known the truth - that Ms. McCullough was having financial difficulty and did not intent to invest her personal equity into the Project, that he would not receive a forty percent ownership, and that Ms. McCullough intended to pay herself a regular salary from his investment

- he would not have invested in the Project. (Trial Tr. p. 136). Again, we review these factual findings for clear error. "As noted, deference to a factual finding on the intent issue is particularly appropriate because it depends largely on an assessment of the credibility and demeanor of the debtor." *In re White*, 128 Fed. Appx. at 1001.

Upon review of the facts here, the Court cannot find clear error in the bankruptcy court's finding of intent to deceive on the part of Ms. McCullough. The Court finds it notable that as a result of representations made by Ms. McCullough, Mr. McRee fully believed that his money was going directly toward working capital so that the bank would provide a loan for the Project, and Mr. McRee anticipated receiving forty percent ownership in the Company. With this knowledge, Ms. McCullough used over $30,000 for various payments to benefit herself and she only gave Mr. McRee a ten percent ownership in the Company. Since an intent to deceive may be found upon a finding of recklessness and the facts in this case demonstrate Ms. McCullough acted with gross recklessness, the bankruptcy court did not clearly err in finding intent to deceive.

### 3. Creditor's Justifiable Reliance

Element three is satisfied by a showing of "justifiable reliance" on the representations made by the debtor. *Field v. Mans*, 516 U.S. 74-75 (1995). The standard of justifiable reliance differs from reasonable reliance in that justifiable reliance is a subjective standard while reasonable reliance is an objective standard. *Field*, 516 U.S. at 70.

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.

*Field*, 516 U.S. at 70-71. Consequently, to prove justifiable reliance, a creditor must show some degree of diligence in determining creditworthiness, but not the degree of diligence used by a reasonable person. *In re Loignon*, 308 B.R. at 249 (citing *First Deposit Nat'l Bank v. Mack*, 216 B.R. 981 (Bankr. N.D. Fla. 1997)).

The bankruptcy court noted that it was clear Mr. McRee should have asked more questions prior to making his investment, but due to the relationship between the parties, Mr. McRee justifiably relied on Ms. McCullough's representations. (Trial Tr. p. 137). This is likewise a factual finding that we review for clear error.

As noted above, justifiable reliance is a subjective standard that takes into account the relationship of the parties. Here, Mr. McRee was Ms. McCullough's step-father. It is not clearly erroneous to find that such a setting would engender more feelings of trust than would occur in some other settings, such as a strictly business relationship. Moreover, Mr. McRee did not rush into making the decision to invest his $40,000. Rather, after Ms. McCullough presented the Project to Mr. McRee, he took some time to think about it prior to making his investment. In sum, the bankruptcy court did not err in finding Mr. McRee justifiably relied on Ms. McCullough's representations.

In sum, the Court finds that the bankruptcy court did not erroneously conclude that the $40,000 debt owed by Ms. McCullough to Mr. McRee is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2).[5]

---

[5] The bankruptcy court concluded that Ms. McCullough's actions constituted misrepresentation by silence or, in the alternative, Ms. McCullough breached the fiduciary duty that she owed to Mr. McRee, which constituted defalcation. Since the Court affirms the bankruptcy court's finding of misrepresentation pursuant to 11 U.S.C. § 523(a)(2), the Court will not address whether Ms. McCullough breached a fiduciary duty owed to Mr. McRee.

C.  **Protective Order**

After Ms. McCullough filed for bankruptcy, Mr. McRee requested and received copies of Ms. McCullough's tax returns and bank statements from the bankruptcy trustee, Mr. Ward. Mr. Ward permitted Mr. McRee to make copies of the records, which were subsequently used as evidence in the trial before Judge Whitley. Ms. McCullough, however, filed a counterclaim in this action, seeking return of these records. Mr. McRee and Ms. McRee are currently in the midst of a divorce and there is an ongoing equitable distribution dispute between the two of them in the North Carolina District Court in Catawba County. Ms. McCullough fears how Mr. McRee can use these documents in this domestic dispute and in her counterclaim requested a protective order or a return of the documents.

The bankruptcy court found that there was nothing improper with allowing Mr. McRee, as a creditor, to review Ms. McCullough's bank statements and tax returns and to use that information for legitimate purposes. (Trial Tr. p. 132). In making this finding, though, the bankruptcy court granted the protective order to the extent of requiring that the information and financial records obtained by Mr. McRee regarding Ms. McCullough be used only for his attempt to collect money in this action and for purposes of the domestic relations case. (*Id.* pp. 132-33).

The Court finds that Judge Whitley's Order regarding Ms. McCullough's financial information adequately protects both parties. Judge Whitley's determination regarding these documents does not bind the North Carolina District Court in Catawba County to use these documents as evidence in the domestic matter. Rather, Judge Whitley simply permitted Mr. McRee to retain these documents while limiting his use of the financial information. There is no

allegation by Ms. McCullough that Mr. McRee has misused the documents nor a showing that Ms. McCullough has suffered harm or damage as a result of the bankruptcy court's ruling.

## IV.  CONCLUSION

Upon review of the entire record in this matter, the Court concludes that there was sufficient evidence at the trial before the bankruptcy court to render the debt claimed by the Appellee against the Appellant non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).  The Court further finds that the bankruptcy court did not err in granting Appellant's requested protective order while permitting the Appellee to retain the financial documents and information for limited purposes.

**IT IS, THEREFORE, ORDERED** that the bankruptcy court's findings are hereby **AFFIRMED**.

———

**Signed: October 21, 2005**

Richard L. Voorhees
United States District Judge